UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA

    - against -

ABRAHAM CASTRO,
               Defendant.

------------------------------------X



03 Cr. 185-01 (RWS)

SENTENCING OPINION

**Sweet, D.J.**

On September 28, 2004, Abraham Castro ("Castro" or "Defendant") appeared before this Court and pleaded guilty to (1) one count of using, carrying, and possessing a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A); and (2) one count of using, carrying, and possessing a firearm in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). For the reasons set forth below, Castro will be sentenced to 360 months' imprisonment, to be served consecutively to the 121-month sentence previously imposed, and 5 years' supervised release. Castro also will be required to pay a special assessment of $200.

**Prior Proceedings**

Indictment 03 Cr. 185 (RWS) was filed in the Southern

1

District of New York on February 14, 2003. Count I charges that in September 1998, in the Southern District of New York, Castro used, carried, and possessed a 9 mm pistol in relation to the conspiracy to murder and murder of Jose Jimenez ("Jimenez"). Count II charges that in April 1999, in the Southern District of New York, Castro used, carried, and possessed a 9 mm pistol in relation to a conspiracy to distribute cocaine as charged in Count I of Indictment 01 Cr. 39.

On September 28, 2008, Castro appeared before this Court and pleaded guilty to Counts I and II. Defendant's sentencing is scheduled for October 23, 2008.

**The Sentencing Framework**

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the advisory Sentencing Guidelines (the "Guidelines") established by the United States Sentencing Commission. As the Supreme Court explained in Gall v. United States, 128 S.Ct. 586 (2007):

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented.

Id. at 596 (internal citation and footnote omitted). Thus, in addition to analysis of the Guidelines, the sentence imposed here results from consideration of:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed-
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for-
>
>> (A) the applicable category of offense

3

committed by the applicable category of
defendant as set forth in the guidelines .
. . ;

(5) any pertinent policy statement . . . [issued by
the Sentencing Commission];

(6) the need to avoid unwarranted sentence
disparities among defendants with similar records
who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims
of the offense.

18 U.S.C. § 3553(a). A sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether that sentence is a so-called Guidelines sentence or not. See Crosby, 397 F.3d at 111.

In light of the Court's statutory responsibility "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," Kimbrough v. United States, 128 S. Ct 558, 571 (2007) (quoting 18 U.S.C. § 3553(a)), and having considered the Guidelines and all of the factors set forth in § 3553(a), it is determined that a Guidelines sentence is warranted in the instant case.

**The Defendant**

The Court adopts the facts set forth in the Probation Department's Presentence Investigation Report ("PSR") with

respect to Castro's personal and family history.

**The Offense Conduct**

The following description draws on the PSR. The specific facts of the underlying conduct are adopted as set forth in that report.

In regard to Count I, Castro, a/k/a "Negrito," a/k/a "Wilson," operated a drug distribution business (the "Negrito Organization" or "Organization") in the Washington Heights section of New York City that distributed cocaine and crack in both wholesale and retail quantities. The Negrito Organization operated out of, among other places, an apartment at 3675 Broadway (the "Apartment") and distributed upwards of 100 kilograms of cocaine a week, employing eight to ten "workers," who performed jobs such as "look-out," "runner," "scaler," and bookkeeper. Castro possessed firearms in furtherance of his drug trafficking activities.

In late 1996, the Apartment, which was used as a stash house by the Organization, was robbed. Large amounts of drugs and money were stolen during the robbery. There was no forced entry, and an elaborate mechanical trap which hid the drugs and money was opened properly, leading Castro to suspect that the

5

robbery was an "inside job." Jose Jimenez, a/k/a "Paca," was an employee of the Negrito Organization who most frequently worked as a look-out at the Apartment. Prior to the robbery, Jimenez had told a friend who was a member of a robbery crew that there were significant quantities of drugs and money in the Apartment, and that no one lived there. As a result of this tip, Jimenez's friend's crew committed the robbery, splitting the proceeds with Jimenez.

Castro eventually came to believe that Jimenez was involved in the robbery, in part because he became suspicious that Jimenez appeared to have more money after the robbery than he had before. Among other things, Castro learned that Jimenez was building a house in the Dominican Republic near Castro's mother's house.

Castro ultimately decided to have Jimenez killed. Castro informed the other equity partners in the Negrito Organization at that time that he was going to use $12,000 of the Organization's funds to hire a hit man to kill Jimenez. Both of the other partners agreed that Castro could use the Organization's funds for this purpose.

To find a hit man, Castro approached a customer, Edwin

6

Torres, a/k/a "Manny." Torres in turn hired Noland Johnson to carry out the shooting. In addition to the $12,000, Castro provided Torres and Johnson with a gun.

Jimenez was shot on September 26, 1998. The day of the shooting, Torres went to a restaurant called the Jubilee in Upper Manhattan and met Jimenez. Torres called Jimenez outside of the restaurant, and when Jimenez came outside, the shooter, an individual working with Johnson, shot Jimenez between six and nine times at point blank range in the abdomen, back, face, and head. Torres later called Castro to tell Castro that the plan had been carried out.

In regard to Count II, on December 11, 1998, officers assigned to the Office of the Special Narcotics Prosecutor for the city of New York ("SNP") and to the New York City Police Department ("NYPD") Manhattan North Major Case Squad ("Manhattan North") arrested two individuals ("CC-1" and "CW-1"), in the vicinity of 24-35 Hillside Avenue in New York, New York, for the commission of state narcotic offenses. An officer later recovered what appeared to be 20 bricks of cocaine wrapped in clear plastic tape from a suitcase in the trunk of the car that CC-1 was driving. The twenty bricks were later found by a Drug Enforcement Administration ("DEA") laboratory to weigh

7

approximately 20 kilograms, all of which contained cocaine hydrochloride.

CC-1 was interviewed by law enforcement officers on December 11, 1998, after being given his Miranda rights. CC-1 stated that CC-1 was aware that there was cocaine in the trunk of the car and stated that there were still between 20 and 30 bricks of cocaine in a first-floor apartment being safeguarded by Abraham Castro, at 25 or 35 Hillside Avenue, Manhattan, New York, but that he did not know which apartment they were in. CC-1 also stated that he worked for Castro, who was described as a Dominican male known as "Morenolito," a/k/a "Negrolito," a/k/a "Wilson," and two co-conspirators ("CC-2" and CC-3").

On January 22, 1999, while acting under the supervision of the SNP and Manhattan North investigators, CC-1 placed a telephone call to (212) 283-8606, a telephone number subscribed to a restaurant located in the vicinity of 151st and 152nd Streets and Broadway in Manhattan. During this telephone call, CC-1 spoke to Castro, who told CC-1 that CC-1's position in the organization was secure and that he (Castro) would post bail for CC-1 when appropriate.

On April 22, 1999, a federal warrant was issued to

search 3675 Broadway, Apartment 1F, New York, New York (the "Apartment"), for narcotics and narcotics paraphernalia. During this search, the following items, among others, were recovered from the Apartment: approximately 72 grams of white powder substance, which tested positive for the presence of cocaine, found in a trap; approximately $24,060 in U.S. currency found in a trap; a loaded 9 mm handgun, bullets, and magazines found in a trap; kilogram wrappers, with what was later found to contain cocaine hydrochloride; and drug ledgers and records with names, amounts of narcotics, and prices. These records contained several references to "Negrito." CW-1 informed investigators that he maintained these records and ledgers, identified the references to "Negrito" as Castro, and confirmed that those documents were drug records and ledgers referencing narcotics transactions.

Castro was arrested in the Southern District of Texas on September 5, 2000. He is currently serving a 121-month sentence imposed for the crimes described above in relation to Count II.

**The Relevant Statutory Provisions**

For Count I, the minimum term of imprisonment is five years, with no statutory maximum, to run consecutively to any other term of imprisonment, pursuant to 18 U.S.C. § 924(c)(1)(A), (D). Count I therefore constitutes a Class A felony, pursuant to 18 U.S.C. § 3559(a)(1). A term of supervised release of not more than five years may be imposed, pursuant to 18 U.S.C. § 3583(b)(1). The maximum fine is $250,000, pursuant to 18 U.S.C. § 3571.

For Count II, a minimum term of twenty-five years' imprisonment, with no statutory maximum, to run consecutively to any other term of imprisonment, is mandatory, pursuant to 18 U.S.C. § 924(c)(1)(C), (D). Count II therefore constitutes a Class A felony, pursuant to 18 U.S.C. § 3559(a)(1). The Court may impose a term of supervised release of not more than five years if a term of imprisonment is imposed, pursuant to 18 U.S.C. § 3583(b)(1). The maximum fine is $250,000, pursuant to 18 U.S.C. 3571.

Any terms of supervised release are to run concurrently, pursuant to 18 U.S.C. § 3624(e).

Castro is not eligible for probation, as probation has been expressly precluded by statute for the offenses in Counts I and II, pursuant to 18 U.S.C. § 3561(a)(2) and 18 U.S.C § 924(c)(1)(D).

Pursuant to 18 U.S.C. § 3013, a special assessment of $100 per count is mandatory.

Pursuant to the Violent Crime Control and Law Enforcement Act of 1994, all offenders on probation, parole, or supervised release for offenses committed after September 13, 1994, are required to submit to one drug test within 15 days of commencement of probation, parole, or supervised release, and at least two drug tests thereafter for use of a controlled substance, unless ameliorated or suspended by the Court due to its determination that the defendant poses a low risk of future substance abuse, as provided in 18 U.S.C. §§ 3563(a)(5) and 3583(d).

**The Guidelines**

The May 1, 2008 edition of the United States Sentencing Commission Guidelines Manual has been used in this case for calculation purposes, pursuant to § 1B1.11(a).

For Count I, which charges one count of using, carrying, and possessing a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A), a guideline

11

computation is not included since the guideline sentence for this count is a mandatory minimum term required by statute pursuant to U.S.S.G. § 2K2.4(b). Similarly, for Count II, which charges one count of using, carrying, and possessing a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A), a guideline computation is not included since the guideline sentence for this count is a mandatory minimum term required by statute pursuant to U.S.S.G. § 2K2.4(b).

Defendant's acceptance of responsibility and criminal history are inapplicable to the mandatory minimum sentence required by statute, pursuant to U.S.S.G. § 2K2.4(b).

For Counts I and II, the guideline range for a term of supervised release is at least three years but not more than five years, pursuant to U.S.S.G. § 5D1.2(a)(1). Supervised release is required if the Court imposes a term of imprisonment of more than one year or when required by statute pursuant to U.S.S.G. § 5D1.1(a).

Because the instant offense is one for which probation has been expressly precluded by statute, Castro is not eligible for probation pursuant to U.S.S.G. § 5B1.1(b)(2).

After determining Defendant's ability to pay, pursuant to 18 U.S.C. § 3571, the Court may impose a fine for Count I, although the Guidelines do not provide a range where there is only a conviction pursuant to 18 U.S.C. § 924(c). For Count II, where there is a federal conviction for the underlying offense, the fine guideline shall be the fine guideline that would have been applicable had there only been a conviction for the underlying offense, pursuant to § 2K2.4(d)(1).

Subject to the Defendant's ability to pay, in imposing a fine, the Court shall consider the expected costs to the Government of any imprisonment, probation, or supervised release imposed, pursuant to § 5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests a monthly cost of $2,076.83 to be used for imprisonment, a monthly cost of $301.80 for supervision, and a monthly cost of $1,905.92 for community confinement.

## The Remaining Factors of 18 U.S.C. § 3553(a)

Having engaged in the Guidelines analysis, this Court also gives due consideration to the remaining factors identified in 18 U.S.C. § 3553(a) in order to impose a sentence "sufficient, but not greater than necessary," as is required in accordance

with the Supreme Court's decision in Booker, 543 U.S. 220, and the Second Circuit's decision in Crosby, 397 F.3d 103. Pursuant to all of the factors, it is hereby determined that a sentence within the Guidelines framework is warranted.

**The Sentence**

For the instant offenses, Castro will be sentenced to 360 months' imprisonment, to be served consecutively to any other term of imprisonment, including the 121-month sentence previously imposed as a result of Defendant's conviction of the charges contained in Indictment 01 Cr. 39, and a five-year term of supervised release. In consideration of the factors set forth in 18 U.S.C. § 3572(a), no fine will be imposed. A special assessment of $200 is mandatory and shall be due to the United States immediately.

Defendant is directed to report to the nearest United States Probation Office within seventy-two hours of release from custody to commence a five-year term of supervised release. It is recommended that Castro be supervised by the district of his residence.

As mandatory conditions of his supervised release,

Castro shall: (1) not commit another federal, state, or local crime; (2) not illegally possess a controlled substance; (3) not possess a firearm or destructive device; (4) refrain from any unlawful use of a controlled substance, and shall submit to one drug testing within fifteen (15) days of placement on supervised release and at least two unscheduled drug tests thereafter, as directed by the probation officer; and (5) cooperate in the collection of DNA as directed by the probation officer.

The standard conditions of supervision (1-13), set forth in the judgment, shall be imposed with the following additional special conditions: (1) Defendant shall obey the immigration laws and comply with the directives of immigration authorities; and (2) Defendant shall submit his person, residence, place of business, vehicle, or any other premises under his control to a search on the basis that the probation officer has reasonable belief that contraband or evidence of a violation of the conditions of the release may be found. The search must be conducted at a reasonable time and in reasonable manner. Failure to submit to a search may be grounds for revocation. Defendant shall inform any other residents that the premises may be subject to search pursuant to this condition.

The terms of this sentence are subject to modification

15

at the sentencing hearing scheduled for October 23, 2008.

       It is so ordered.

**New York, NY**
**October 20 , 2008**

ROBERT W. SWEET
U.S.D.J.